Good morning. May it please the court, counsel. Nell Brown from the Office of the Federal Defender on behalf of Petitioner Mayes. I'm hoping I'll be able to reserve four minutes for rebuttal. This case involved two black defendants who were tried together. There were other co-conspirators who were not tried with them. The case involved a home invasion robbery and a murder of a white drug dealer and his family. I'm going to focus on the Batson issue first. The jury veneer in this case was made up of 50 potential jurors. Only five of those were black, so approximately, well, so 10 percent of the — What was that number again? Fifty. It's either 50 or 51 jurors total. Five-oh. Five-zero, yes. But when they — when the jurors are selected, is the entire veneer in the courtroom at one time? It did not appear that that was the case. They did jury selection over the course of three days. And the first day, I think they had 29 jurors in the courtroom. On the second day — and one of those was black, only one on that first day. They didn't do any strikes that first day. They came back the second day, and I think there were another — Well, what was that juror's name? That's Abigail Lawrence. She was within the first several jurors seated in the jury. I think she was the 11th seat. The second day, they did another 21 or so jurors. And of those — What was her last name? Lawrence, L-A-W-R-E-N-C-E. Of the second group, there were four black jurors. And then they did a third batch that was primarily focused on choosing an alternate — two alternate jurors, but that also resulted in two people who made it on to the regular jury. Two people, two — sorry, you said two people? Two of the — yes, two of the third batch made it on to the jury. They were — this record is not clear. It's clear who's black, at least that there are five black jurors. It isn't entirely clear who isn't black. And I've been presuming that if it's not mentioned that they're black, that they are white. Well, let me ask you this. So you had one — the first batch was how many? I have 29 in the first batch. What was the second batch? The second batch, there were several that are excused for cause. So how many number in the second batch? I have numbers 30 through 50, but a number of those were not available for selection by the time they got to the peremptory challenges. So you had 20 more, huh? Approximately 20 more. And then the third batch. The third batch, it looked like they maybe had 12 more. The jury — the court immediately excused two of those. And they were only looking for two more jurors for the main panel, and they had several that they selected from for alternates. Well, I have a note here that there were 17 prospective jurors. And the prosecutor ran criminal background checks on eight or nine of them. That's correct. So those 17, what batch were they in? That's batch 2. And it's — Batch 2. Yes. And batch 2 is the group on which background checks were run. They did run them. The State chose, I believe, discriminatorily to disproportionately target blacks. They did eight or nine background checks. Three of those people that they checked were black. And as a result, the State then used — tried to challenge for cause two black female jurors and was successful with one of those challenges. But that means that of the eight or nine that they ran, three were black and the rest were not. That's correct. So approximately 33 percent or more. The record's not clear about who all the background checks were of. But we know that three were black, Gonzalez, Taylor, and Tanner. But it wasn't — I mean, I want to make sure I understand. It wasn't just the black jurors that the prosecutor ran the background checks on, correct? That's correct. They were eight or nine is what the record says. Eight or nine jurors were checked. And so why — and it sounds like you're asserting that somehow that's an inference of racial animus or discrimination on the part of the prosecutor. Or am I incorrect on that? I stated that 33 percent or more of those background checks targeted black jurors. That's disproportionate. Well, how many percent were non-black? The other 66 percent. But the blacks only made up 10 percent of the available jurors overall. And is there — is something in the record — I presume — I mean, we don't have a good record on the first day, correct? Correct. But on the second day, is there something in the record that indicates the background check explanation? No. There's not much on why — there's not much on that it was done initially, and then there are a couple places in the record where it's explained that that background check was done. But there's not much explanation of why, other than that the prosecutor says he was concerned that some of the jurors were not telling the truth about whether or not they had previously appeared in court. And is that objectionable? Was it objected to? It was not. Okay. No. And I — this is not — these aren't — the use of preemptories, I think this is an important issue for the background, for setting the scene for understanding the context in which the Batson challenge to the juror Sterling is made. I don't think it's specific. I think it should be considered as part of the totality of the circumstances. But it's not necessarily clear that it's targeting blacks. As I said, I believe 33 percent or more of those background checks did target blacks. But that, as you say, is less than the 66 percent that targeted whites. Well, how many — how many black prospective jurors were there? There were five prospective black jurors. Five, and three of them the prosecutor ran background checks on. That's correct, Your Honor. Was there a background check on Sterling? We don't know that, Your Honor. The record is only clear that there were background checks on Taylor — sorry, not Taylor, Tanner, Gonzales, and — Tanner, Gonzales, and Taylor. Yes. Okay. So there — nothing supports in the record that there was a background check done on every black. That's correct. The record is silent on whether background checks were done on the other two blacks on the jury. Could I ask just a more specific question? And maybe you've answered it, but just to be clear, there was no explanation given for how the prosecutor chose to — the nine that were checked? Other than that the prosecutor says he had concerns that some of the jurors were not truthful about whether they appeared in court, there's no explanation for how he selected those eight or why he believed they were not truthful. Was it eight or nine? It says eight or nine. It's not clear in the record whether it's eight or nine. But anyway, no explanation given. No. Thank you. Let me ask you this. Now, we had a black juror, and I hate to describe people by their skin color, so I hope whoever is ruling this universe will forgive me. But the record shows that — okay, let me ask you this question. Here we had Juror Sterling, and he was excused. He was — right? Correct. Okay. And how did his answers to the question that the prosecutor asked, I think of practically all of the prospective jurors, wanted to know how a prospective juror would feel about a witness who testified under a plea agreement? Okay? How would you compare Sterling with white prospective jurors, their answers, who were not stricken by the prosecutor? Well, Your Honor, that's my central argument, and I think that's the most important thing for the Court to look at in this case. When you look at Sterling — Go ahead. Just answer my question. When you look at Sterling's testimony, his answers are very benign compared to the white jurors who are at least equally, if not more, concerned about the testimony of a co-defendant accomplice in this case. In my reply brief, which I filed recently, I addressed the testimony of Parker, who is a white female that the State passed over. I also addressed Lindo, and I'm guessing his name is Yagi or Jagi. If the district attorney was genuinely concerned about jurors who had a concern with the testimony of a co-defendant, the DA would have struck those individuals. Parker and the DA engaged in a fairly lengthy colloquy. She expresses very serious concern about a testifying co-defendant. Then around page 295 in the excerpt of record, my opposing counsel does point out that she seems to soften briefly. But then the prosecutor asks her additional questions, and she makes some statements that should have been incredibly troubling to the district attorney if he was genuinely concerned. I'm talking about Parker now. I'm talking about Parker, yes. She says, and this is that excerpt of record, page 298, that she's concerned about how you evaluate the truth when a person has so many reasons to lie. Then she says, I hate to have to say this, but someone who's committed several felonies, I might not think that they were too truthful. And that's where the colloquy basically ends with regard to the juror's feelings on a testifying co-defendant. The prosecutor's statements, I think, are very telling here. The prosecutor expresses concern with Parker's demeanor. He says that she was outwardly appeared to be, she had a noticeable reaction, I think is the word he uses, to his questions about a testifying co-defendant. In contrast, the prosecutor's questions of Sterling result in fairly benign answers, but then it's the prosecutor's commentary after Sterling speaks that I think is very telling. The prosecutor keeps saying things like, I guess you're saying what everyone's saying, or I guess you're all saying the same thing. So the prosecutor's position during the colloquy shows a lot more concern for Parker and a lot less concern for the fairly benign things that Sterling is saying. Well, let's look at that, because this is, I think, a significant point. And I think my focus is on Ms. Parker as well. And it seems like the question here is whether it was unreasonable for the trial court to conclude, as the prosecutor asserts or asserted, that Sterling expressed the most concern about co-felon testimony. Do you agree? I do agree. Okay. And so it seems like we have to be convinced that applying the normal standards of appellate review, that the court cannot reasonably conclude that the finding is supported in the record. So when we look at the record, we look at what Ms. Parker says. And she noted that, as you indicated, that co-felon testimony was not necessarily what you want, and that it would be very hard to evaluate, basically because the co-felon might have a motive to lie. Nonetheless, Parker said it could go either way. That's at Excerpt 289. And she did note that a person might be testifying for ulterior motives and later said she might think someone with prior felony convictions was not being too truthful. I think that's the comments that go to this issue that she made. When we look at Mr. Sterling, and I want to make sure I get your full view on this, when Ms. Parker offered that she could go either way with a co-felon's testimony, Mr. Sterling immediately interjected that you can't put a whole lot of credibility into it at Excerpt 289. He said that the co-felon would have nothing to lose so he could sit up there and say whatever he has to say and however he wants to say it. He also said that having the co-felon testify in that trial was going to be a mess. He included that. And then while Mr. Sterling expressly disavowed any notion that he would ever believe the co-felon's testimony, he immediately followed with the statement that he would only believe such testimony if he liked this person. Now, I don't think those were his words. I thought that was in quotes at 290. He also gave two flip answers. When asked whether he could see any benefit to having a co-felon testify, Sterling said, I don't know, but I really don't care. And when asked whether it surprised him that the testifying co-felon might have a few prior convictions, Mr. Sterling said, well, no, it doesn't surprise me, but it don't do anything for me either. That's at 294. And, you know, if you think I have that wrong, let me know. So that, coupled with the, what the defense counsel said at the time, I just wonder whether or not, you know, this supports the Batson and purposeful discrimination because at the time, not only did May's counsel not object to that characterization of the facts that the prosecutor made, he actually said that while it was certainly debatable, that's in quotes, I think, from the record of what defense counsel said, he also said, I understand why the prosecution are saying about Mr. Sterling. So that seems to indicate. He does say that much later. And doesn't that seem to indicate that the demeanor, conduct, what the judge may have observed, especially based on defense counsel's statement, would have been a sufficient basis to rule the way he did? The case law is fairly clear that the judge needs to actually rely on demeanor. And we can't really tell from what defense counsel is saying what the judge viewed about demeanor. The judge doesn't say anything other than comparing. The judge doesn't say anything specifically about Sterling's demeanor or the prosecutor's demeanor in making what is a credibility determination. The judge focuses on the content of Sterling's answers. Well, but the statement that he expresses the most concern, doesn't that encompass, you know, beyond statements perhaps how he said it? The prosecutor says that he has the most concern. Right. But that's not borne out by the record in my view. But did the judge agree with that? The judge rubber-stamped that, I believe. Well, okay. Yes. The judge did. I don't think that the judge agreed with it specifically. The judge said essentially that Parker also had serious concerns, but yes, Sterling had serious concerns, too. So the judge doesn't actually endorse that Parker's concerns or Sterling's concerns were more serious. He just says that they both had concerns. And I think if a black juror and a white juror are equally concerning, then that's striking one but not striking the other, striking the black juror but not the white juror based on that reason, it's suggested that that is purposeful discrimination, which is the analysis here. Now, correct me if I'm wrong here, but I thought from the bench, the trial judge found that Sterling, when he was referring to a witness testifying under a plea agreement, this is what I think the trial judge said about Sterling, that he practically told us that if we call this guy, and I think they're referring to Richard Hall, an accomplice who struck a plea deal and who testified against Mays and Knight, if we call this guy, no chance he was going to believe him. Now, I can't find any place in the record where Sterling said this. You're correct. He never said that. And the judge mischaracterizes his testimony at that point in the transcript. You're talking about page, excerpt of record page 375. That's an absolute mischaracterization of Sterling's statements. When asked and pressed on whether or not he would consider testifying co-defendants, such as Hall's testimony, he explains that he would judge them using what he uses in his everyday life, which is his natural skills that he has in judging people. And he essentially says that he would use his common sense to do that. Is that the point in the transcript where he makes a comment about I would assess whether or do I like this guy, my everyday skills? That's correct. Okay. So following up on Judge Merguia's question, can you pinpoint exactly what second of that exact sentence in the transcript for me? What is said or what section? It's page 290. Okay. Because somehow today I can't put my finger on it. You've answered my question, though. I believe it's at page 290. And the full quote as I have it here is what I use, they ask what he would use to judge this type of witness, and he says, I would use what I used in everyday life, just my natural skills I have in judging people. I like this person. I don't like this person, you know. He has nothing to lose, so he can sit up there and say whatever he has to say and however he wants to say it. And that's at page 290. Shortly after that, the prosecutor says, right, he's not going to lose. And I guess if I went across the board, you are probably pretty much all saying the same thing. So the prosecutor agrees with Sterling that the witness isn't going to, quote, lose. That's a statement to the panel, to the veneer. That's not a statement to the judge as to his basis for striking Mr. Sterling. There's a difference, I think. But, I mean, you're using the statement that he's making to a juror, and one of the parameters are for the prosecutor to determine whether or not there's a reason, can't be based on race or have discriminatory purpose. But statements that he's making to a juror, to the jury veneer, to be held accountable by that, I'm not quite sure there's any case law to support that. Well, as Your Honor's concerned with what the judge is seeing in the terms of the demeanor of the jurors and the prosecutor as he then later judges the credibility of the prosecutor's strikes, he can look at all of that, including what it was that he focused in on or didn't focus in on. So I think it's totally fair game for the record, us to look at the record now, this Court to look at the record now. It's the demeanor of everyone involved, correct? Well, I think that that's definitely. Because right now it seems like you're saying, well, he can focus on the demeanor of the prosecutor but not on the jurors. But we look at the totality of the circumstances. That's correct. We owe a great deal of deference to the trial court because he was there. That is true. And in this circumstance or in this case, it looks like you're pointing to a lot of different things. You know, the fact that the background check was on 33 percent of African-Americans, it seems like there's possible explanation. There were other non-African-Americans or non-blacks that were also, there were background checks. We don't know the reason for it. You also point us to Mr. Taylor and Ms. Gonzalez. It seems like the purpose in saying that Mr. Taylor was also strict, it seems like there were bases for that that don't deal with race. Are you saying that there were race reasons for striking Mr. Taylor and Ms. Gonzalez? That is not the focus of the claim as it's been raised in this Court. The focus of the claim here is that a comparative juror analysis with respect to Sterling, specifically looking at Parker, but also Yagi and Lindau, shows that we can't defer to the credibility findings of the State trial court, and we don't defer under AEDPA 2254d2 because the reasons that the prosecutor used applied equally to the black who was struck and to the non-blacks who were not struck. And Judge Pregerson has addressed this very issue before in his McLean v. Prunty case from 2000. That case, he explains that a comparative analysis of jurors struck and those remaining is a well-established tool for exploring the possibility that facially race-neutral reasons are a pretext for discrimination by a prosecutor on the basis of race in exercising peremptory strikes in violation of Batson. Judge Pregerson foreshadowed the comparative analysis that the Supreme Court would later do in the Miller L. case, which is a habeas case, and in the Snyder case, which is a direct appeal case. Counsel, may I ask a question? Your time is so short, and I want to have a chance. Actually, that's generous for me to describe it that way. But I want to be clear on this point. The first reason the prosecution gave when the Court asked the prosecutor to explain the reasons for the challenge I think appear on 342, but I hope you will correct me if I'm wrong. And my question is this. I read the record to show that the first reason given was, quote, this is a person who repeatedly, during defense voir dire, uttered phrases that indicated identification with defendants in a criminal case. Are you arguing that this statement is indicative of racial bias? I am, Your Honor. The State trial court did not address that reason that the prosecutor raised, but I do think that it needs to be analyzed. And I would say that saying that Sterling identified with the defendants, when you compare his answers with that of other white jurors, shows that it's really just code for discrimination. There is no basis to say that Sterling identified any more than any other, than some of the other white jurors, except for the fact that he is black. Because that issue wasn't addressed by the State court, I haven't focused on it as much, but it is absolutely one of the reasons the prosecutor gave and it needs to be analyzed in terms of the record. Is it the first reason he gave? It is the first reason he gave. I'm more than out of time, so I will take my seat. Well, it's all right. We've got a lot of questions for you. When the prosecutor asked Mr. Sterling, asked this question, Mr. Sterling, are you telling me that just because this guy was dealing, you know, making a plea bargain, you are never going to believe anything he says? And Sterling's reply was, no, not at all. And the judge just totally mischaracterized what Sterling had to say. What did the judge say about Sterling? The judge says that Sterling, quote, there's no chance he's going to believe him, meaning the guy who's getting the plea deal, which is, I think, directly contrary to what Sterling says and an unreasonable determination of the facts. Where is that statement? Is there any statement in the record of what that corroborates or supports what the judge said that Sterling said? No, Your Honor. Absolutely none? No. It just made out of thin air? Yes. Okay. And there's a lot of that going on here. Huh? Yes, Your Honor. And, okay. Bring on the prosecutor. Okay. May it please the Court. I'm Pamela Walsh for the appellee, Jeff Primo. There are a few factual points that I'd like to bring to the Court's attention that may help the Court decide the case more easily than some of the issues we've already been discussing. In Miller L. v. Dretke. Well, can I just ask you? Sure. Just give me about five minutes. I want to just ask you a couple of questions here. From the bench, the trial judge found that black prospective juror Sterling, referring to a witness testifying under a plea agreement, this is what the judge said, practically told us that if we call this guy that refers to Hall, no chance he's going to believe him. Now, where in the record can I find that that's what Sterling said? The judge couched that comment in terms of he practically said. He was characterizing a series of statements made by this particular juror. I have a quote here. He practically told us that if we call this guy, no chance he was going to believe him. You know, there's nowhere in the record, I'm quoting the judge, where this guy practically told us that if we call this guy, no chance he's going to believe him. And I've looked through the record. I can't find anything on that. I believe that is a, giving the trial court the benefit of the doubt, I believe that is a fair characterization, a summary of the comments that Juror Sterling made. Okay, but, all right, but what did Sterling say when the prosecutors asked Sterling, are you telling me that just because this guy was dealing, you are never going to believe anything he says? Sterling replied, no, not at all. That's at ER-290. Sure, but Juror Sterling also made a series of other comments that have already been discussed by the bench indicating that he would have a great deal of difficulty. You see, the judge is quoting Sterling. I've got quotes here, and there's no such quote, this is what Sterling said. There is no quote to that effect, that's correct. There's no quote to that effect. And according to the trial judge, in referring to witness testimony, under a plea agreement, Mr. Sterling said, quote, I'm not going to believe it. That's not in the record, too, that quote, is it? Not a quote, correct. Yeah. And it was a quote that the judge made. And I can't find anything in the record where that was said. And now, now, isn't it the case that when Parker said in referring to a witness testifying under a plea agreement, that she was concerned about how you evaluate the truth when the person has so many reasons why they may not tell the truth? She said that, right? Yes. Ms. Parker, who did not serve on this jury, said that. Yeah. And Parker said, I hate to have to say this, but someone who has committed several felonies, I might think that they weren't too truthful also. Now, did the prosecutor ask to strike, remove Parker from the jury? He did not have the chance because when the prosecutor had five preempts left. The answer is no. We don't know what he would have done. He didn't. Isn't that right? The defense did before he could, yes. Well, that's right. The defendant struck that person. Yes. But Parker let that person stay on. Parker didn't object to that person. Parker, what were you going to say? He had five preemptive strikes. Oh, yes. Well, what I was trying to say at the beginning is under Millerell v. Dretke, the Court repeatedly refers to the comparative analysis being between jurors that the prosecutor strikes and jurors who actually serve on the jury. Parker did not serve on the jury. A few minutes after these exchanges happened, the defense used a preempt against her. The DA still had five strikes left. So we don't know whether the DA would have stricken her eventually or not. The same is true with another juror that is mentioned by my opponent. This appears in the supplemental reply brief. The prosecutor did not strike Juror Fisher, even though she specifically stated she could relate to the defendants. The State did strike Juror Fisher, and you will find that at ER-499. So with respect to two of these, Ms. Parker and Ms. Fisher, neither one of them served on this jury. How about Sterling? He was stricken. He was stricken, yes. By the prosecutor. Yes. Huh? Yes. And you only need one under Batson. One. One. Just one. That's correct. That's all you need. And you get a new trial. Yes. For Batson. Counsel, all three of us have served as trial court judges, which may be good news for you, maybe bad news for you, but we've all been there. And there's, of course, a lot of authority, as Judge McGee was indicating, about the extent to which we need to, you know, as appellate court judges, be careful about second-guessing credibility determinations. And in the Batson challenge, I think it's pretty – in the Batson context, I find it particularly challenging because, of course, we weren't there, and there's all these intangibles that come in that don't always translate into a transcript. We're all really well aware of that. On the other hand, we have the trial court judge's characterization of Mr. Sterling's comments here, and I think per Judge Pegerson's questions, there's certainly room for disagreement about whether that was an accurate characterization if we just look at the transcript alone. If we give too much deference or read too much into what might have been there, what might else have been going on in the courtroom, where the trial court judge hasn't given us an indication that he's taken other stuff, other considerations into account, then you see it could be a circumstance where there's never going to be a Batson challenge because it doesn't – we see on the – in the transcript, we see a really disturbing statement, and then we write it off to, gee, there must have been other stuff going on in the courtroom, other factors. And so my question for you is, where's the best authority we should look for where we draw that line? Where we can't see indication in the record of other factors that were taken into consideration, I'm pretty uncomfortable about dreaming them up. Okay. The cases that I would point you to are felt here. Can I just interrupt you? Okay. You know, I have problems hearing you, and you're a modern woman, and you speak faster than I speak. Do you want me to slow down and do it again? What? Do you want me to slow down and ask it again? A little bit. But what is the gist of your question? My question – I'm speaking too quickly. My question really is a concern about the tension between giving deference to the trial court judge, which we must do, and the problem of giving so much deference where there isn't any indication in the record that other factors influence the trial court judge's characterization of Mr. Sterling's testimony. So I'm asking, what is the best legal authority where we can look for guidance about how much deference we should really give when the transcript does not tell us that there were other factors that went into the judge's characterization? I'll discuss the transcript in a moment. But the cases are Felkner and Hernandez, Rice and Briggs. Thank you. Okay. With respect to the transcript in this case, at the time that Sterling was actually challenged, this is what the trial court said. Mr. Sterling did express this rather strong opinion about a potential witness of the State. And as the Court mentioned during opposing counsel's argument, that was confirmed by one of the defense attorneys. I understand what they are saying about Mr. Sterling. That appears at 340 ER 349. So there was a – apparently a demeanor-based assessment going on. As you all know, there's a big difference between I will be fair and I will be fair. Why do you think that's a demeanor-based assessment? Well, there's a big difference. A strong opinion? There's a big difference between a judge who actually quotes a witness and one who misquotes a witness, 180 degrees. So you think that was a demeanor assessment because the defense counsel said that Mr. Sterling had a strong opinion? It was the trial court who said that. Oh, forgive me. I'm sorry. The trial court. That's why you think that was a demeanor? Yes. I think it can be based on words. It can also be based on demeanor. So at most, it's a mixed bag there, as is this transcript. This particular transcript, when you look at Mr. Sterling and Ms. Parker, is one of those that is ripe for the call to deferred credibility. We do have two individuals who are somewhat close here. My reading of Ms. Parker's testimony is that she was softer, more nuanced, a little bit less definite than Mr. Sterling in terms of the cold transcripts and the words that she said. But we cannot assess from a cold transcript how it was said, the tone of voice, the body language involved in the two. And that goes to my question. That's always true when we're looking at a Batson challenge on appeal. So if we follow that too far, there's never going to be a successful Batson challenge on appeal. And that's where I'm trying to draw the line, because unlike other Batson challenges, this one has a characterization by the trial court judge that I struggle to find support for. What's the strongest support for the trial court judge's characterization of Mr. Sterling's testimony? I mean, his responses. The statements that we've already discussed from Mr. Sterling, they're a little bit stronger than Ms. Parker's statements, if you're going to look at the words. Why are they stronger? Can you show me where? Well, what else have we got to look at but words? I mean, that's our punishment in life. We have to read what, you know, judges say and lawyers put down on paper. I understand that. And I believe that that is where the caution comes in in a lot of the cases that are telling the appellate courts to defer in this kind of case. You could get away with all sorts of discrimination by saying, well, you know, we're  Well, you know, there's an attitude there and the voice was this way or that way, and, you know, he looked a little bit cross-eyed at me and sparked and all that. Well, you know, I guess I suppose what you could do is have the record show and go on from there. But the ---- And it might be a little, you know, the standard is different were this a direct appeal, but when you've got a Federal habeas case like this, you've got the double deference standard going on. And that really compels the court to be doubly cautious in a case like this. Yes. And the judge should be, because they're all going to end up here anyway. And we're not looking for more business. All he had to do was use a little judgment and a little discretion and a little restraint and a little more accuracy, and maybe it would have been a different story, but I think we need to thank him for keeping us in business. I have a question regarding the transcripts, if they're complete. There's some questions I had because the prosecution, prosecutor had discussion of the Tet Offensive during the Batson Challenge. Was there a juror questionnaire here possibly? Do you know? Judge Markey, I couldn't hear your question. I'm sorry. There was a statement regarding Vietnam War experience and the Tet Offensive and discrepancy between years. I think it was Mr. Taylor had served. Nobody seemed to say, oh, you're wrong about that. It seemed like they were working off the same sort of understanding, but it's not clear where the source of that understanding was. I believe there was a juror questionnaire. And in Mr. Taylor's case, it showed his prior military experience. Is that part of the record? The juror questionnaires? No, not as far. No. Okay. And getting back, Judge, to your question, just as an example, on page 289, Ms. Parker is talking about the her ability to assess the credibility of a State's witness, such as the one proposed here. And she says at the end of her statement, it could go either way. It's not necessarily what you want. Mr. Sterling says you can't put a whole lot of credibility into it. It's a matter of degree. She is backing off a little bit. Her statements are a little bit more tentative. He is more definite. And that's all I'm saying. I'm not saying that this is not a close call. It is when you're just looking at the words. How is it when he says no, not at all? That's what Sterling's reply was. Yeah. Mr. Sterling, are you telling me that just because this guy was dealing, you are never going to believe anything he says? Sterling replied, no, not at all. And on the same page a few lines down, he says he has nothing to lose, so he can sit up there and say whatever he has to say and however he wants to say it. And some of the others said the same thing. Similar. Similar, yeah. You know, I'm not going to believe them, but they still ended up on the jury. Oh, I also wanted to question, if I may continue for just a moment. Sure. The Court had a question about the background checks. There is not a real explanation in this transcript from the prosecutor about the reason for the background checks, but there were some things that I noticed about the individuals involved. Juror Tanner, who was one of the black females who was challenged for cause, before the background checks said that she was involved in the STOP program. This is at ER 263, which is apparently a drug treatment program. I thought it was traffic court. Stop. Could be. I think it's a traffic, anyway. All right. And then at ER 314, after that, the DA says to the Court, you know, I'd like some time to check on the background of some of, a few of the jurors. Then at 323, he comes back and says, Ms. Tanner failed to disclose this prior arrest, and that was for a traffic, reckless driving or a traffic-related violation. She said she was a, they'd asked her if she'd been in court, and she said, I graduated. From here, from the STOP program? Correct. Okay. So he must have known that if she graduated, there was a reason she was in the program. Right. Is she one of the people he checked? Yes. Okay. And so that, I'm just inferring from that exchange that one of the reasons they checked her in particular was because she said something that made them think that she did have some involvement with the criminal justice system. With respect to Ms. Gonzalez, who was another. She didn't hide anything. Excuse me? I mean, she said she graduated from the STOP program. Sure. But she had also answered a questionnaire. She didn't want her to get up in front of the other jurors and say, yeah, I've done this, I have drugs, I'm a bad person. She did. She did make that disclosure that she graduated from the STOP program. That's enough for the other side, the prosecutor, to understand that she had gone through this program and probably went through it because of the use of drugs. I believe it's on page 323 that the DA was saying that she was expressly asked about her involvement in the criminal justice system, and she had said that she had had none. So when she mentioned the STOP program. At what point did they ask, have you, have you, about your prior court experience? Have you been to court before? And she said, I graduated from the program. So there was an anomaly that caused them to think she might have failed to disclose something. I'm understanding you're telling me that's why she would have been one of the eight or nine. That's what I'm inferring from this exchange. I can't say definitely because the DA did not say definitely. And one other minor thing that I noticed was with respect to Juror Gonzalez. As you know, this was a homicide involving gangs. When, after the criminal background check on juror, on some of the jurors, the DA, when they excused, used a preempt on Gonzalez later on, said, oh, by the way, she did have some involvement, not with the court system, but she had an arrest, and it did involve gangs. It was with our gang unit. So I'm. Respect on Gonzalez. But we don't know why. No. No. Other than that. So it seemed to me that perhaps there was a check involving persons they thought might have some sort of gang affiliation. But we don't have a definite explanation. So of the, of the eight, do you know if it's eight or nine? He said eight or nine. Okay. That's all I could find, too. Okay. And of those three were black people, and one, at least one person was Hispanic? Gonzalez? Right. Gonzalez, in the record, there's a question about her, about what ethnicity or race she is. And the court eventually said she is black. So I am going with she is black. Okay. So is there anything else? The trial court had some common-sense explanation to Mays regarding the preemptory challenge and how it worked. It appears Mr. Mays is suggesting in his supplemental reply brief that we can look to the trial court's common-sense explanation in conducting our review under AEDPA. Is that part of the trial court's recent decision? What's your view on that? I don't believe so. It's sort of an after-the-fact assist to defense counsel to help explain the procedures to defendant, the defendant at the time. I mean, I think it's put in more layman's, less sophisticated terms. So I don't think it's something that you should completely disregard. I think you can certainly look at it as one of the circumstances. But in terms of an elaborate rationale for the courts, the basis of what the court's doing, I would take it for what it's worth. But saying, talking about the circumstances, do we look at the totality of the circumstances here? I think what you do is, yes, you look at the totality of the circumstances and see whether they support what the trial court has done with a great deal of deference involved. Right. Well, in looking at the totality of the circumstances and giving that, give us your best summation here what we should focus on, or why do we go with your view and not the opposing view. My best summation is this. What you've got going in this kind of Batson challenge, and as Judge Christensen said, it's going to happen in a lot of Batson challenges, is you have an assessment here of the prosecutor's credibility and the demeanor of the jurors, and you've got the trial court judge making that assessment with these people right in front of him for an extended period of time. So with that in mind, that you've got a credibility determination going here that there is a great deal of deference owed. Thank you. Kennedy. If you do that, then you might as well just forget about Batson. I think that there are going to be some. The reason for cases like Batson is that we need to be sensitive that this is a multiracial country, and we have to be particularly careful and sensitive to that. And we're trying to get over 300 years of slavery in this country. You know, you understand that. I agree. Yeah. And it's going to take us another couple hundred years to do it the way we're going. So this is just part of that process. That's part of the process. It's there to make us nicer people. And it's easy. It's easy to follow. And we have to bear that in mind. Prosecutors need to bear that in mind. I do. I agree with you totally, Judge Preterson. But I also think that you are going to have cases where there is going to be a record where it was plain that there was discrimination. Cases like Miller L., where there's a history of discrimination and a lot of other factors showing discrimination. This is so nuanced that I think you have to fall back on the credibility findings. Well, it's a nuance when you have five prospective jurors that are black, and he runs all these checks on three of them. And we don't know what happened, who the other the others were, do we? Is there anything in the record about that? No, because there's no evidence that it's race-based, and the DA was telling the court this is not race-based, it is not based on gender, and the court got to look at the prosecutor as he was saying that and assess his credibility. Oh, well, you know, the court sees the prosecutor every day. He's in the courtroom every day. You know, I've had prosecutors when I was on the State court system and public defenders, I see them every single day. And some you believe and some you don't. Counsel, we've kept you at the podium. Oh, I don't know about that. We've kept you at the podium. But can I ask you one final question? Sure. I promise that will be my last. Should I be concerned that the prosecutor's first response when the judge asked about the bump was to the effect that this prospective African-American juror might identify too closely with the African-American defendants? No. That seems to be based on a comment that he made, we have to be really careful because our verdict is going to affect these guys' lives. That they. It sounds race-based, though, doesn't it? The prosecutor is saying he identifies too closely with these two folks. What does that mean? Is there not indication of a race-based reason from the prosecutor? I don't think so. I don't see why it's race-based any more than identifying with a couple of other guys. Gender-based. Could be. Gender-based. Could be he likes people from Portland. It could be anything. But there's nothing about it that smacks of any kind of racial identification, at least the way I read it. And the prosecutor's comment about identifying with the defendants is followed right up. I mean, the next sentence practically is, and, oh, by the way, he doesn't seem to want to believe our witness. So I would take the two together. Thank you. Let me ask you this. When the judge evaluated May's Batson challenge, did the judge compare Sterling's answers against similar white prospective jurors, Parker's, Lindo's, Strachan and Chagny's answers? That's required by Miller L. Did he do that? Did the judge make a comparative analysis? The judge did compare with Parker. I know that. And that shows up. He was supposed to make a comparative analysis with all of them. Didn't he? At the end, after the preempts are done, he was asked to make a comparison with Parker, I believe, when the Batson challenge was made. And he did. By then, at that point in time, the other jurors had not been decided. And so I don't know if the judge could. That's another thing that's not clear to me from the record. When were these challenges made? Were they made out of the presence of the jurors, the other jurors? Was it done as a sidebar? Was it done in open court? How was it done? It was done in open court. It seems to have been done outside. I'm gathering from the conversation that it was done outside the presence of the jury. Well, usually the transcript, it would indicate that it was a sidebar conference. I don't see that here. Yeah. Was it done just right out and all the other jurors are listening to all that? I don't. And I'm just my recollection, based on the tone of the conversations, and that's all I can recall at this point, it seems that the challenges were done outside the presence of the jury in open court. Well, outside the presence. So you think it was. So when the court reporter comes to the sidebar, they don't indicate this is what they're supposed to do. I can't really tell. It seems to me when I read it, they just, this was all going on in open court. It seems that way. And there's not really an explanation on the record that I recall about what procedure they were using. But it seems like some of the conversations about the jurors were so frank that I doubt the jurors were actually present. But on the other hand, it seems as if they were calling jurors in from time to time to fill the vacated seats. So it may have been mixed, but I did not see a real explanation on the record in terms of what procedure was being used. All right. Thank you. It's been a pleasure having you here. Thank you. We'd ask for an affirmance. What? I said we'd ask for an affirmance, please. Okay.
judges: Pregerson, Murguia, Christen